UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID DOBKOWSKI | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| VS. | : | NO. |
| | : | |
| YALE UNIVERSITY, | : | |
| | : | |
| DEFENDANT. | : | JANUARY 20, 2014 |

## C O M P L A I N T

1.  This is an action for money damages to redress the deprivation by the defendant of rights secured to the plaintiff by the laws of the United States and the State of Connecticut.  The defendant subjected the plaintiff to, inter alia, violation of the rights secured to the plaintiff by the provisions of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 et seq, as amended; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 et seq.; Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C.A.§ 2000e; the Connecticut Fair Employment Practices Act, Sections 46a-58(a) et seq. of the Connecticut General Statutes; and to the intentional infliction of emotional distress, in contravention of the laws of the United States and the laws of the State of Connecticut, as invoked pursuant to the Court's supplemental jurisdiction.

2.  Jurisdiction of this Court is invoked under the provisions of Sections 1331, 1337, 1343, 1343(3) and/or 1367(a) of Title 28 of the United States Code.

3.  During all times mentioned in this action, the plaintiff, David Dobkowski was and is an adult citizen of the United States residing in, Shelton, Connecticut.

4.  At all times relevant to the instant complaint, the defendant Yale University was and is an employer located in New Haven, employing more than one hundred persons.

5.  At all times referenced herein, the individuals mentioned herein were agents, officers or employees of the defendant University, acting in said capacity.

6.  The defendant Yale has adopted, ratified, sanctioned or otherwise accepted as its own the actions, omissions, words and conduct of the the individuals named herein, and of their agents, officers or employees.  The defendant University has thereby incurred liability for the for the acts, omissions, statements and conduct of the said individuals and of their agents, officers or employees.

7.  The plaintiff is a highly skilled and exceedingly well qualified individual with a strong educational and business background.

8.  The plaintiff is a qualified individual with a disability, or is perceived as such by the defendant.

9.  The defendant is aware of the plaintiff's disability or perceives him as disabled.

10.  At all times relevant to the instant complaint, the plaintiff was able to perform the essential functions of his employment with or without reasonable accommodation.

11.   The plaintiff was employed by the defendant for approximately two years.

12.   The plaintiff was Customer Service Manager of the defendant's Yale Medical Group.

13.   The plaintiff's work has always been excellent and the plaintiff's working relationships with all staff have always been excellent.

14.   On or about 10/27/12, after an appointment with his surgeon, the plaintiff learned that he needed surgery without delay.  The plaintiff's surgeon scheduled him for surgery on 11/7/12, his next available date.

15.   On 10/28/12, the plaintiff informed his supervisor, Sally Thibodeau, that he needed  surgery, and would be out the week of 11/7/12 to 11/11/12.  The plaintiff informed her that it possibility could be a little longer.  The plaintiff's surgeon was unsure of the recovery period.

16.   On 11/4/11, Thibodeau, Ouida Haynes, a supervisor who reported to the plaintiff, and the plaintiff met in Thibodeau's office to discuss coverage while the plaintiff would be out of the office on medical leave.  The plaintiff was unsure how long he would be out, but if it ran into the following week, he stated that he would make arrangements with payroll.

17.   During the discussion, Thibodeau was angry, and asked the plaintiff if he knew about other staff's Paid Time Off leave (PTO) when he scheduled his surgery. The plaintiff told her that he did not, and also told her that he didn't have a choice in

scheduling the surgery, as his surgeon stated that he needed surgery as soon as possible.

18.   Thibodeau got very angry and upset about her own personal plans, and said, "I have PTO scheduled to visit my son's school, and now I'm going to have to cancel it!"  Ouida said, "don't worry, we can work something out" but Thibodeau insisted, and said, "NO, I have to cancel it!"

19.   Thibodeau then said, "I don't agree with this.  It isn't like your surgery is emergent, you're not having cardiac surgery."  Thibodeau was unaware of the type of surgery that the plaintiff was scheduled to have.

20.   The plaintiff emphasized to Thibodeau that he really needed to have the surgery now.  She then said "I know how these doctors are, they always make it seem like you need surgery right away."  The plaintiff was very nervous about his upcoming surgery, and left Thibodeau's office feeling very upset as a result of Thibodeau's comments.

21.   On 11/13/11, the plaintiff emailed Thibodeau and defendant Yale's Human Resources Leave Consultant Stephanie Santore.  The plaintiff informed the defendant that he was not able to return to work on 11/14/11, by order of his physician. Thibodeau replied via email that the plaintiff will need to file for a leave of absence when missing "such a significant amount of time", and that he would need a note as to when he can return.  She also demanded that the plaintiff call her directly rather than

email her.  The plaintiff replied that he was in a great deal of pain, was feeling very sick,

and that it would have been difficult and embarrassing for him to try to carry on a phone

conversation with her while he was recovering.

22.  The plaintiff reminded her that they did discuss the possibility of him being

out on medical leave for more than one week, and that he had made provisions with the

payroll department to accommodate this.  Thibodeau replied by email, stating: "as you

are aware, your sudden departure caused both Ouida and I to have to cancel paid time

off we had already requested well in advance."

23.  On 12/5/11, the plaintiff returned to work from medical leave.  The plaintiff

emailed Stephanie Santore and Thibodeau his release to return to work from the

surgeon.  Thibodeau immediately replied via email "This is the first I am aware of this- I

see the letter was dated November 23rd, however I am just receiving this - I was not

notified of the official return date by you nor did I hear from you at all the last month."

Santore replied to Thibodeau that "You were notified by me via email on November

28th that Mr. Dobkowski was returning to work on 12/5/11.  He had no way to send the

letter earlier, so I advised him to bring the note with him today upon his return.  No other

action is needed on your part."

24.  Thibodeau's conduct was making the plaintiff very uncomfortable.  On

12/5/12, the plaintiff reached out to defendant's H.R. Generalist Lauren Storer.  Storer

suggested that the three of us meet to discuss the issues, but the plaintiff was afraid

that Thibodeau would be upset that he contacted H.R., and that it would make things even worse for him.  Storer said she wanted to think about it, and would call the plaintiff back with some options.

25.  Later that day, the plaintiff sent an email to Thibodeau asking her if he could meet with her to catch up on a few things.  She replied "Ouida will be here tomorrow and the three of us can meet at 11:00 to discuss the status of the department.  We will also meet later in the week with Lauren Storer. She has not provided me with a date and time yet."

26.  As a result of the plaintiff's complaints, Thibodeau became even more hostile and distant, at times almost ignoring the plaintiff.  The only time the plaintiff would see Thibodeau in person was when others were also present, and she refused to meet with him alone.

27.  Any meeting with Thibodeau and Lauren concerned the plaintiff a great deal because he complained to Storer in confidence. The plaintiff informed Storer that he was fearful that if Thibodeau knew that he was contacting H.R. about her, she would redouble her harassment and retaliation.

28.  On 12/6/11, Thibodeau met with the plaintiff.  She brought Haynes to this meeting.  When they sat at the conference room table, Thibodeau looked at Haynes when she spoke, even if it was in reply to a question or comment that the plaintiff had made directly to her.  The plaintiff felt very uncomfortable.

6

29.   On 12/16/11, The plaintiff reported to Thibodeau's office their bi-weekly one-on-one meeting.  This was a standing meeting that was created a long time prior, for the purpose of discussing work in the department.  As the plaintiff approached, Thibodeau left her office.   Thibodeau looked at the plaintiff and said "do you need to see me?"  The plaintiff told her that he twas here for their bi-weekly meeting.  She said "I don't have a meeting on my calendar.  Do you need to see me?"  It was very uncomfortable for the plaintiff, as many employees were staring at him, waiting for him to answer.  Thibodeau told him to come back in a half hour.  The plaintiff came back, and Thibodeau did not meet with him.  The plaintiff went back to his desk and did not hear from her all day.

30.   The plaintiff was scheduled to meet  Lauren Storer of H.R. about the workplace environment on  12/19/11.  She emailed the plaintiff to tell him that it was going to be cancelled and rescheduled, and that she would contact him on Monday to discuss it in more detail.  The plaintiff never heard back from her.

31.   On 12/20/11, the plaintiff went to Thibodeau to inquire about his merit increase for fiscal year 2011.  Thibodeau was responsible for the plaintiff's performance evaluation, on which the plaintiff's salary is based.  There was no increase in the his paycheck, and the plaintiff asked her if it was a mistake.  Thibodeau said that based on the plaintiff's negative review, The plaintiff was not eligible for a merit wage increase.

32.  The plaintiff was surprised at this, because his work had always been excellent.  Further, Thibodeau met with the plaintiff in his office previously, and read to him what she said was the plaintiff's performance review.  What she read was favorable, and indicated to the plaintiff that he had met expectations.  The plaintiff was pleased with the feedback she had given when she read the review ti him.  Thibodeau never stated that the plaintiff's overall rating was "needs improvement."

33. The plaintiff told Thibodeau that she never gave him a copy of his review. She replied that she thought she had.  Thibodeau said that she thought she put it in a green folder and maybe put in on the plaintiff's chair, but then said maybe she didn't because she did not want anyone else to pick it up.  Thibodeau then said she would get the plaintiff a copy.

34.  The plaintiff was very upset and disappointed, because he had no indication from Thibodeau that she thought the plaintiff's performance was not acceptable. In fact, what she told him in his office was quite the opposite.  Approaching 2 years at the defendant, the plaintiff was still making the same salary as when he started his employment.

35.  The plaintiff finally received a copy of the plaintiff's performance review from Thibodeau.  It was handwritten, obviously scrawled in a few minutes.  When the plaintiff read the review, The plaintiff couldn't believe it.  The plaintiff's overall rating was "Needs Improvement".  The review was almost completely negative, and vastly different from

what Thibodeau read to him in his office.  There were many false claims, including that the plaintiff does not meet deadlines and doesn't respond quickly to emails.  The plaintiff never missed a deadline, and the plaintiff prided himself on responding quickly to all requests.

36.  Thibodeau underlined words on the front page under the "needs improvement" category – Incumbent typically needs further coaching and development to fully meet position expectations.  The plaintiff never received any "coaching and development" from her or anyone else, before or after the false review.

37.  On the signature page, Thibodeau signed and dated it "9/19/11", when she actually met with him on 9/20/11.  She wrote the words "did not sign" where the plaintiff's signature should be, and wrote that they met and she provided a copy on 9/19/11.  She implied that the plaintiff refused to sign the review.

38.  There is no truth to anything she wrote.  The plaintiff did not meet with her on 9/19, the plaintiff was not provided a copy, and the plaintiff did not have the opportunity to sign the review.   The plaintiff does not believe that the handwritten review was the original review that Thibodeau summarized for him in his office.  The plaintiff believe that she went back and rewrote it to make it thoroughly negative in retaliation for the plaintiff's medical leave of absence and the plaintiff's complaints about her.

39.  An overall rating of "needs improvement" marks an employee of the defendant  with permanent negative on their record, and denies a person from receiving a merit increase.  Without a doubt, the overall rating should most definitely be revealed to the employee during the performance review meeting.

40.  The written review the plaintiff was given was entirely different from what Thibodeau told him in person.  The plaintiff was not told that his overall rating was "needs improvement" when it was read to him.  The plaintiff believes that Thibodeau changed the content of the review to be very negative.  The result was that the plaintiff was not given a merit based salary increase, although the plaintiff's work warranted it.

41.  On 12/21/11, the plaintiff received an email from Thibodeau, claiming that he was unavailable to staff and patients for twenty minutes earlier in the day.  The plaintiff was discussing an important employment related matter wih the supervisor of Patient Services, and he told this to Thibodeau.

42.  Thibodeau questioned the plaintiff, and she acted like she didn't believe him when the plaintiff answered her.  The plaintiff was not allowed to meet with another manager regarding a work issue without being scrutinized.  Thibodeau said that there was a "pressing patient issue" but no staff confirmed that this was so.

43.  On 12/21/11, the supervisor spoke to his manager about the above issue. He was told by his manager to "stay away from Dave, he's trouble".   Thibodeau was

speaking to other supervisors and staff about the plaintiff in an attempt to ruin the plaintiff's reputation with the defendant and other management staff.

44.   On 1/6/12, the plaintiff went to Thibodeau's office for their bi-weekly meeting.  Thibodeau was not in her office, nor did she attempt to reschedule.  This was the second scheduled bi-weekly meeting on the calendar since the plaintiff's return from medical leave, and Thibodeau did not show up for either meeting.

45.   On 1/6/12 at 3:30, the plaintiff received an email from Thibodeau to come to her office.  Other than when the plaintiff went to her office questioning the merit increase, this is the only time the plaintiff was alone with her since the medical leave.  When the plaintiff arrived, she instructed him to close the door and proceeded to tell the plaintiff about alleged complaints about him.  Thibodeau asked of the plaintiff recalled a particular event that occurred in November, to which he replied that he did not know of it.  Thibodeau then stated, "how could you, you weren't here. That's why you should have been calling in to the office when you were out on leave."

46.   This meeting ended with Thibodeau screaming at the plaintiff to get out of her office.  She slammed the door in the plaintiff's face.  This occurred in front of other employees.  The plaintiff had to walk back to the plaintiff's office feeling extremely humiliated and very upset.  The plaintiff called H.R. Generalist Lauren Storer to let her know what had just happened.  The plaintiff left a message, telling her that Thibodeau just kicked him out of her office and slammed the door in his face.  The plaintiff again

made a request to meet with Storer with the hopes that she could put a stop to the treatment the plaintiff was receiving from Thibodeau.

47.   On 1/9/12 at 2:00 p.m., Thibodeau cancelled a meeting with the registration leads, supervisor Ouida Haynes and the plaintiff.   The meeting was called to discuss the department status our workload.

48.   On 1/9/12, the plaintiff received a voicemail and email from H.R. Lauren Storer.   She told him to come to a meeting tomorrow at 11:00 a.m. with her and Thibodeau.   She also offered to meet with him alone on Wednesday, 1/11/12 at 11:00 a.m, as the plaintiff had previously requested. The plaintiff emailed Storer confirming their meeting.

49.   In his email, the plaintiff specifically stated that Thibodeau was retaliating against him for his medical leave of absence.

50.   Thereafter, the defendant cancelled the meeting with Storer and Thibodeau.

51.   Thibodeau was intentionally creating workplace hardship for the plaintiff. For example, a Lead representative distributes work to other C&T's at 7:00am each morning.   In the event this person is out of the office, other C&T's to fill in and distribute the work.   Thibodeau learned of this and said the C&T's are not allowed to distribute work to other C&T's, and that someone from the management team would have to distribute the work, meaning the plaintiff.   Thibodeau knew that due to the plaintiff's home circumstances with his children, it would be very difficult for him to be in the office

12

at 7:00 a.m., especially for an entire week.  Contrary to her assertions, it is perfectly

acceptable for a C&T to distribute work to other C&T's.  In fact, the Leads are also

C&T's.

52.  On 1/11/12, the plaintiff met with Lauren Storer of Human Resources.  The

plaintiff detailed the retaliation and discrimination issues that he was experiencing since

his medical leave.  The plaintiff requested that he be able to work elsewhere in the

university due to the hostile working environment.  The plaintiff told her that he was

experiencing a great deal of anxiety, and having a difficult time functioning, even

outside of work.  The plaintiff could not sleep at night, and felt sick to his stomach every

morning driving to work.  The plaintiff told her that Thibodeau is retaliating against him

because of the medical leave, and that Thibodeau's comments and email regarding the

fact that she had to cancel her own PTO was proof that this was a personal thing for

her that she is holding against the plaintiff.

53.  On 1/19/12, Storer and the plaintiff met to continue the discussion.  Storer

informed the plaintiff that she reported the situation to the EEO office of the defendant,

and suggested that he do the same.  Storer also told him that the Staffing Department

of the defendant would assist him in finding another position at Yale.  Storer promised

to provide him with the names of an EEO employee, and a staffing person.

54.  On 1/26/12, the plaintiff emailed Storer to remind her that she had referred

him to EEO and Staffing, and was going to get him contact names.  She replied that

she "crossed it off her to-do list, ands didn't actually do it".  She said she would do so as soon as she returned to her desk.

55.   On 1/30/12, The plaintiff sent another reminder email to Storer, as she never sent him the contact names.  She replied with the name of EEO representative Karen Wu, but still did not provide the plaintiff a name from Staffing.

56.   On 2/3/2012, Storer emailed the plaintiff the name of a recruiter from H.R. staffing, Laura Olsen.  In this email she mentioned that one thing Laura Olsen is likely to ask about references, and inquired as to what he think Thibodeau will say about him as the plaintiff's current supervisor.

57.   On 2/8/12, the plaintiff met with Laura Olsen of defendant's Staffing department.  The plaintiff left her office very frustrated, because she did not assist him in addressing the plaintiff's hostile and retaliatory work environment.  All she told the plaintiff was to update his resume, and to look at posted postions to see if anything interested him.

58.   On 2/8/12, the plaintiff also met with defendant's EEO representative, Karen Wu.  The plaintiff reviewed with her all the details of the retaliation and discrimination he had been enduring.  The plaintiff gave her the names of employees who were aware of the misconduct and the plaintiff agreed to give her copies of all of the plaintiff's documentation.  Wu said that her investigation should take a week or so.

59.  On 2/10/12, the plaintiff dropped off a file of printed copies of all the plaintiff's documentation to Karen Wu.

60.  On 2/14/12, the plaintiff emailed Karen Wu electronic PDF files of the same documentation he had given her on 2/10/12.

61.  By 2/23/12, Thibodeau either cancelled all bi-weekly one-on-one meetings with me, or she simply did not show up.  Since the plaintiff's medical leave, the plaintiff have not met with Thibodeau alone since the day she threw him out of her office.  She continued to ignore him, and to exclude him from all issues, information and developments related to the registration department.  When they were together in a meeting with others, Thibodeau completely ignored the plaintiff as if he wasn't there.

62.  Thibodeau has held several meetings with other supervisors in the plaintiff's department, but excluded him.  The plaintiff felt very isolated, even in his own department.

63.  As 2/23/12, the plaintiff still had not heard back from defendant's EEO. Although The plaintiff continued to look for other job opportunities in the defendant,  he was deeply concerned about job references, as the person about whom he was complaining held the key to the plaintiff's future.  No one at the defendant gave him a solution as to how references could be handled in this situation.

64.  On 2/27/12, at a workplace meeting, Thibodeau deliberately attempted to publicly embarrass the plaintiff in front of his peers as well as the COO, and to also make him feel worthless.

65.  On 3/7/12, the plaintiff reported to Karen Wu that on 3/6/12, a staff member located at Science Park who was discussing a work issue with him was told to get off the phone.  When she replied that she was speaking with the plaintiff, her supervisor said "I know, and so does Thibodeau, and she wants you off the phone."  She later decided to call Thibodeau to discuss why she is not allowed to call her Manager, and why her private line was being monitored.  When the employee asked Thibodeau if she knew she was speaking to me, Thibodeau said yes, she knew.  She then asked Thibodeau "so I can't call my boss?" and Thibodeau replied "that's right."

66.  On 3/9/12, Thibodeau altered the working hours of an employee and instructed Haynes and the plaintiff to "figure out a plan for coverage daily at George Street until 6:00 p.m." The employee was specifically hired to be the late night supervisor since there is staff at George Street that work until 7:00pm.  The plaintiff's hours for the prior two years had been 8:30 a.m.  –  5:00 p.m., as he has young children and obligations to them.   The change in hours was intentional by Thibodeau, to force him to stay late every night and work until at least 6:00 p.m.  As Haynes did not work at the George Street facility, but was at Science Park, the plaintiff would be forced to cover the shift.

16

67.  Based on the change, the plaintiff had no choice but to give up volunteering with the Shelton Little League because he could not be on the field by 6:00 p.m.  This was yet another deliberate hardship Thibodeau created and imposed upon the plaintiff.

68.  Thibodeau continued to ignore the plaintiff and exclude him from department information and meetings.

69.  On 4/19/12, Karen Wu finally met with the plaintiff.  She claimed the results of the investigation are inconclusive, and that she found no evidence of retaliation.  She said it is Thibodeau's word against his.  The plaintiff was devastated, and concerned about his future with the defendant.

70.  On 4/24/12, the plaintiff sent an email to COO of the defendant, Marianne Dess-Santoro.  The plaintiff asked her to meet so that he could discuss his complaints with her.  The plaintiff did not receive a response to his request for a meeting.

71.  On 5/3/12, the plaintiff received a phone call from Dess-Santoro's secretary, who said she and Thibodeau would like to meet him in the boardroom.  When the plaintiff arrived, he was introduced to Jacqueline Sessler, Associate Director of Human Resources.  The plaintiff was then told that due to a reorganization, the plaintiff's position with defendant Yale University was being eliminated and will terminate on 7/31/12.  The plaintiff was given a 90 day notice letter that said that he was not required to report to work during the 90 days.

72.  The plaintiff was thus terminated from the defendant, effective on 7/31/12.

73.  The reasons given by the defendant for the plaintiff's poor review, lack of merit increase and termination are pretextual.

74.  For an extended period of time continuing to the date of the plaintiff's termination, the plaintiff has been subjected to an ongoing pattern of harassment, discrimination, hostile work environment, disparate treatment based upon the plaintiff's disability or perceived disability, the plaintiff's use of medical leave, and the plaintiff's complaints thereon.

75.  The conduct of the defendant and its agents, officers or employees has been continuous, persistent and unabated.  The actions of the defendant therefore constitute a continuing course of conduct.

76.  The reasons given by the defendant for the plaintiff's poor evaluation and termination are pretextual.  The true reason for the conduct of the defendant is because of the plaintiff's disability or perceived disability and in retaliation for his opposition to the defendant's conduct.

77.  The plaintiff has exhausted his administrative remedies in this matter, and has sought and received a Notice of Right To Sue letter from the United States Equal Employment Opportunity Commission, and a Release of Jurisdiction from the Connecticut Commission on Human Rights and Opportunities.

18

78.  In the manner described above, the defendant has subjected the plaintiff to, inter alia, discrimination based upon disability, perceived disability and retaliation.

79.  In the manner described above, the actions of the defendants constitute violations of the provisions the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 et seq., as amended.

80.  As a result of the defendant's conduct, the plaintiff has suffered extreme financial loss and harm; loss of employment; loss of personal and professional reputation; severe emotional distress; has experience physical harm and suffering; has been forced to incur attorney fees, costs and expenses and other harm.

**COUNT TWO**

1.- 78.  Paragraphs 1 through 78 of Count One are hereby made Paragraphs 1 through 78 of Count Two.

79.  The conduct of the defendant constitutes violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 et seq.

80.  As a result of the defendant's conduct, the plaintiff has suffered extreme financial loss and harm; loss of employment; loss of personal and professional reputation; severe emotional distress; has experience physical harm and suffering; has been forced to incur attorney fees, costs and expenses and other harm.

**COUNT THREE**

1.- 78.  Paragraphs 1 through 78 of Count One are hereby made Paragraphs 1 through 78 of Count Three.

79.  The conduct of the defendant constitutes violation of the provisions of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C.A.§ 2000e in contravention of the Constitution and laws of the United States.

80.  As a result of the defendant's conduct, the plaintiff has suffered extreme financial loss and harm; loss of employment; loss of personal and professional reputation; severe emotional distress; has experience physical harm and suffering; has been forced to incur attorney fees, costs and expenses and other harm.

**COUNT FOUR**

1.- 78.  Paragraphs 1 through 78 of Count One are hereby made Paragraphs 1 through 78 of Count Four.

79.  The conduct of the defendant constitutes violation of the provisions of the Connecticut Fair Employment Practices Act, Sections 46a-58(a) et seq. of the Connecticut General Statutes, in contravention of the Constitution and laws of the State of Connecticut.

80.  As a result of the defendant's conduct, the plaintiff has suffered extreme financial loss and harm; loss of employment; loss of personal and professional

reputation; severe emotional distress; has experience physical harm and suffering; has been forced to incur attorney fees, costs and expenses and other harm.

**COUNT FIVE**

1.- 78.  Paragraphs 1 through 78 of Count One are hereby made Paragraphs 1 through 78 of Count Five.

79.  The actions of the defendant were extreme and outrageous.

80.  The actions of the defendant were intentional.

81.  The actions of the defendant were likely to cause severe emotional distress.

82.  The actions of the defendant caused the plaintiff to suffer extreme emotional distress.

83.  The conduct of the defendant constitutes the intentional infliction of emotional distress, in contravention of the laws of the State of Connecticut, invoked under this Court's supplementary jurisdiction.

84.  As a result of the defendant's conduct, the plaintiff has suffered extreme financial loss and harm; loss of employment; loss of personal and professional reputation; severe emotional distress; has experience physical harm and suffering; has been forced to incur attorney fees, costs and expenses and other harm.

**WHEREFORE**, the plaintiff claim judgment against the defendant as follows:

      A.  Compensatory damages;

      B.  Punitive damages;

      C.  Attorney fees and the costs of this action pursuant to all applicable provisions of state and federal law;

      D.  Equitable relief pursuant to 29 U.S.C.A.§§ 626(b) and (c), 633a(b) and (c) and all other applicable provisions of state and federal law;

      E.  Such other relief as this Court shall consider to be fair and equitable.


## <u>CLAIM FOR JURY TRIAL</u>

The plaintiff claims trial by jury of all issues in this case.


THE PLAINTIFF



BY_____/s/_William S. Palmieri_____
          WILLIAM S. PALMIERI
          Law Offices of William S. Palmieri, L.L.C.
          Federal Bar No. ct14361
          129 Church Street,  Suite 405
          New Haven, CT 06510
          PHONE: (203) 562-3100
          FAX:  (203) 909-6006
          EMAIL:  wpalmieri@hotmail.com
          His Attorney